[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 14, 2002
THOMAS K. KAHN
CLERK

_____

No. 00-15623

_____

D. C. Docket No. 99-00256 CR-T-001

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES T. KIMBALL,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(May 14, 2002)**

Before EDMONDSON, CARNES and SILER[*], Circuit Judges.

PER CURIAM:

_____

[*]Honorable Eugene E. Siler, Jr., U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

Appellant/Defendant James Kimball ("Defendant") was convicted of conspiracy to distribute in interstate commerce a prescription drug without a prescription with the intent to defraud or mislead, in violation of 18 U.S.C. § 371; of distributing in interstate commerce a prescription drug without a prescription with the intent to defraud or mislead, in violation of 21 U.S.C. § 331(a); and of making false statements, in violation of 18 U.S.C. § 1001. The district court sentenced Defendant to 13 years' imprisonment.

Defendant brings this appeal, challenging his conviction on the following grounds: that he was denied his Sixth Amendment right to counsel when the district court allowed him to represent himself; that the district court's comments and acts unfairly prejudiced Defendant before the jury, denying him the right to a fair and impartial trial; and that the district court erred by not suppressing evidence seized during a search of his home. Defendant also raises a number of challenges to his sentence.[1]

We affirm the conviction and the sentence.

## DISCUSSION

---

[1]We see no merit in Defendant's claims that the evidence seized in the search of his home should have been excluded and that the district court's conduct unfairly prejudiced him. We therefore affirm the district court on these issues without further discussion.

2

I.      Self-Representation

We see no reversible error in the district court's grant of Defendant's motion to represent himself.  In Faretta v. California, 95 S. Ct. 2525 (1975), the Supreme Court determined that the Sixth Amendment affords criminal defendants the right to defend themselves if they so desire.  See id. at 2532-34.  But the Court also wrote that "in most criminal prosecutions defendants [can] better defend with counsel's guidance than by their own unskilled efforts."  Id. at 2540.  Therefore, before a defendant is allowed to waive the assistance of counsel, he "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." Id. at 2541 (internal citation and quotations omitted).

We have written that the "ideal method" of assuring that a defendant understands the consequences of a waiver is for the trial court to conduct a pretrial hearing.  United States v. Cash, 47 F.3d 1083, 1088 (11th Cir. 1995).  At this hearing -- commonly referred to as a "Faretta inquiry" -- the district court should inform the defendant of the nature of the charges against him, possible punishments, basic trial procedure and the hazards of representing himself.  See id. The purpose of this hearing is to allow judges to determine whether the defendant

3

understands the risks of self-representation. "The closer to trial an accused's waiver of the right to counsel is, the more rigorous, searching and formal the questioning of the trial judge should be." Id. (quoting Strozier v. Newsome, 926 F.2d 1100, 1105 (11th Cir. 1991)).

In this case, the district court conducted a Faretta inquiry. During the inquiry, the district court repeatedly told Defendant that it was a bad idea to defend himself and warned defendant about the specific risks and difficulties in doing so. At the conclusion of the inquiry, the district court determined that Defendant understood the warnings; and the court determined that Defendant had "freely, knowingly, voluntarily and intelligently waived his right to counsel." Therefore, the district court allowed Defendant to represent himself.

A district court's conclusion that a defendant's waiver is valid -- that it is knowing, voluntary, and intelligent -- is a mixed question of law and fact that we review *de novo.* See id. We have identified several factors that are especially important to the determination of whether a defendant's decision to proceed *pro se* is valid. These are the factors: 1) the defendant's age, health, and education; 2) the defendant's contact with lawyers prior to trial; 3) the defendant's knowledge of the nature of the charges and possible defenses and penalties; 4) the defendant's understanding of the rules of evidence, procedure and courtroom decorum; 5) the

defendant's experience in criminal trials; 6) whether standby counsel was appointed and, if so, the extent to which standby counsel aided in the trial; 7) any mistreatment or coercion of the defendant; and 8) whether the defendant was attempting to manipulate the trial. See id. at 1088-89; Fitzpatrick v. Wainwright, 800 F.2d 1057, 1065-67 (11th Cir. 1986).

We have reviewed the record, and we conclude that most of the factors point in favor of a ready finding that Defendant's waiver was valid. That Defendant was not coerced into defending himself is undisputed, and no indication exists that Defendant was attempting to manipulate the trial process by asking to represent himself.

Although Defendant does make arguments on the other factors, most of his arguments are not powerful. Defendant is only sixty years old and is in good mental and physical health. Although Defendant's formal education ended in the eleventh grade, he has been a fairly successful and sophisticated businessman. In addition, Defendant was represented by a lawyer -- Elliot Dunn -- prior to trial. According to Dunn's statements at the Faretta inquiry, Dunn explained the risks of acting *pro se* and advised Defendant against doing so. Furthermore, Dunn was appointed by the district court as standby counsel. Moreover, Defendant did have some courtroom experience: in the past, he had acted as his own lawyer in a felony

5

case. While it is true that the earlier trial took place over twenty years before this case and was tried to a judge instead of to a jury, the experience should have illustrated for Defendant the inherent difficulties of acting as one's own lawyer.

Two of the factors merit further discussion. The first deals with Defendant's understanding of the applicability of the rules of evidence, procedure and courtroom decorum. Defendant argues that this factor should weigh in his favor, because the district court failed to conduct a detailed inquiry on the extent of Defendant's mastery of the rules.

This argument misunderstands the law. The purpose of a Faretta inquiry is not to determine the extent of a defendant's legal knowledge or to determine how good of a trial advocate a defendant will be. See Faretta, 95 S. Ct. at 2541 ("[A] defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation . . . . [A defendant's] technical legal knowledge, as such, [is] not relevant to an assessment of [a defendant's] knowing exercise of the right to defend himself."). A defendant need only "be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." Id. (internal quotations omitted). Therefore, we do not have to determine -- and the district court did not have to ask -- whether, for example,

Defendant could recite the steps to introduce a document into evidence or whether Defendant could define "hearsay" and list the various exceptions to the hearsay rule. See, e.g., id. ("We need make no assessment of how well or poorly [the defendant] ha[d] mastered the intricacies of the hearsay rule."). Instead, we need only to determine whether Defendant understood that rules do exist to govern the procedure of a trial, the introduction of evidence and the behavior of advocates and to determine whether Defendant understood that he would be bound by those rules. Our review of the record convinces us that Defendant did understand these things.

We are more troubled by whether Defendant understood the consequences of a guilty verdict and what would happen if the trial went badly for him. The district court's discussion of Defendant's possible sentence is a bit worrisome. Defendant's indictment listed eight counts. The district court went through each count and told Defendant the maximum sentence under each count: Counts 1 and 8 carried a five-year maximum; counts 2 through 7 carried a three-year maximum. And the district court informed Defendant that the court had the power to sentence him to consecutive sentences. The district court also told Defendant, "the penalty that you might suffer if you are found guilty, and I want to make it sound as bad as I can, it's five years, could be 28 years . . . ."

The district court, however, did not stop with a warning as to the maximum or theoretical penalties Defendant faced. Here is the worrisome part. Instead, the district court -- in Defendant's presence -- discussed with the prosecutor Defendant's likely sentence under the federal sentencing guidelines. When asked whether the government had calculated Defendant's sentence under the guidelines "to a certain extent," the prosecutor responded: "To a certain extent. I'd say that *three years* is very reasonable and middle of the road." (emphasis added). Defendant stresses that he gave this statement great weight, seeing it as the real risk he was facing.

If the district court had simply told Defendant the maximum conceivable sentence he faced, this case would be an easy one. Our cases do not require that a district court, in a <u>Faretta</u> inquiry, estimate what a defendant's actual punishment under the sentencing guidelines will be. It seems a better practice for district courts to abstain from doing so. The facts of this case illustrate the potential problem.

The application of the sentencing guidelines and the determination of a defendant's actual sentence is a pretty complicated business. In many cases it will be extremely difficult to determine, in advance of trial and a presentence investigation, what a defendant's ultimate sentence will be. More important, it

8

serves no essential purpose.  The purpose of a <u>Faretta</u> inquiry is to ensure that a defendant understands the risks of defending himself; this purpose is satisfied when a defendant is aware of the maximum penalty he faces.  <u>See, e.g.</u>, <u>United States v. Farhad</u>, 190 F.3d 1097, 1098 (9th Cir. 1999) (finding that a waiver was valid where "[t]he district judge warned [defendant] that he was charged with 19 counts [and] informed him of the maximum penalty on each count . . .").

Although the district court should not have attempted to predict what Defendant's actual sentence would be once all the sentencing guidelines were calculated, we conclude that the inaccurate prediction presented to Defendant does not require us to reverse Defendant's conviction.  Based on our review of the record, we are satisfied that Defendant understood that, if convicted, he could be sentenced to a long prison term: certainly one at least as long as the thirteen years the district court eventually imposed.  The district court never promised Defendant that his sentence would not exceed three years.  On the contrary, the district court specifically told Defendant that the prosecutor would not be held to his initial sentencing prediction.  And, more than once, the district court told Defendant that he could be sentenced to consecutive terms and that his sentence could be as long as 28 years' imprisonment.  Given all of the circumstances, we agree with the

9

district court that Defendant's waiver in this case was knowing, voluntary, and intelligent.

II.    Sentencing Claims

Although Defendant raises many challenges to his sentence, only two have sufficient merit to warrant discussion.[2]  First, Defendant claims that the district court erred in sentencing him under U.S.S.G. § 2F1.1 (2000).[3]  One of the statutes Defendant was convicted of violating is 21 U.S.C. § 333(a)(2); the sentencing guidelines identify two different sections that apply to such violations: 2F1.1 and 2N2.1.  According to the guidelines, "if the offense involve[s] fraud, apply § 2F1.1."  U.S.S.G. 2N2.1(b)(1).

Defendant argues that any fraud he might have committed was only fraud against federal and state agencies and was only a regulatory offense and that,

_____

[2]Defendant raises the following sentencing issues on appeal: 1) that the district court erred in sentencing him under Section 2F1.1 of the sentencing guidelines; 2) that the district court erred when it departed upwards from the sentencing guidelines; 3) that the district court erred in finding that his offense was committed through mass marketing and in enhancing his sentence under Section 2F1.1(b)(3); and 4) that the district court erred in enhancing his sentence under Section 2F1.1(b)(5) for relocating his scheme to another jurisdiction, for committing a substantial part of the scheme from outside the United States, or for using sophisticated means.

[3]Our citation to section 2F1.1 represents the guidelines applicable when Defendant committed his offenses and when his sentence was imposed.  Section 2F1.1 has since been deleted and consolidated with section 2B1.1.

therefore, his crime did not involve "fraud," as contemplated by the guidelines. This argument lacks merit.

Defendant was convicted of "distributing a Prescription Drug without a prescription with the Intent to Defraud or Mislead;" therefore, an essential element of his conviction is that the offense involved fraud. In the past, we have concluded that *convictions* under 21 U.S.C. § 333's provisions dealing with "intent to defraud or mislead" can be sustained where the fraud was committed against government agencies. See United States v. Bradshaw, 840 F.2d 871, 874-75 (11th Cir. 1988). Defendant offers no good reason, and we can think of none, why our conclusion should be different for sentencing purposes. All other circuits that have considered this issue have come to the same conclusion: it is proper to apply Section 2F1.1 to defendants who commit fraud against a government agency. See United States v. Andersen, 45 F.3d 217, 219 (7th Cir. 1995) (rejecting argument that "fraud on a regulatory agency does not support the use of § 2F1.1"); United States v. Arlen; 947 F.2d 139, 146 (5th Cir. 1991); United States v. Cambra; 933 F.2d 752, 754 (9th Cir. 1991).

Defendant also challenges the district court's upward departure from the determined offense level and the method by which the amount of the upward departure was calculated. Federal law states that a district court should not

11

increase a defendant's sentence above the applicable range "unless the court finds that there exists an aggravating . . . circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553(b). "[T]o depart from the guidelines, the sentencing court must determine (1) whether any factor makes the case atypical, meaning that it takes the case out of the 'heartland' of cases involving the conduct described in the applicable guideline, and (2) whether that factor should result in a different sentence." United States v. Regueiro, 240 F.3d 1321, 1324 (11th Cir. 2001). A district court's decision to depart from the sentencing guidelines is reviewed for abuse of discretion. See Koon v. United States, 116 S. Ct. 2035, 2046 (1996); United States v. Melvin, 187 F.3d 1316, 1320 (11th Cir. 1999) ("Because the district courts see so many Guidelines cases, district courts have an institutional advantage over appellate courts in determining whether a case is outside the heartland, and thus their decisions are entitled to substantial deference.").

In this case, the district court identified several factors that took Defendant's acts outside of the "heartland" of typical fraud cases; among the factors was the harm posed to the public by Defendant's scheme to defraud the government. Such a risk of nonmonetary harm is specifically identified by the Sentencing Guidelines as an appropriate grounds for departure. "In cases in which the loss determined

12

under subsection [2F1.1(b)(1)] does not fully capture the harmfulness and seriousness of the conduct, an upward departure may be warranted. Examples may include the following: (a) a primary objective of the fraud was nonmonetary; or the fraud caused or risked reasonably foreseeable, substantial nonmonetary harm." U.S.S.G. § 2F1.1, Application Note 11(a). Where the Guidelines encourage a particular factor as grounds for departure, a departure is appropriate if the applicable guideline does not already take that factor into account. See United States v. Hoffer, 129 F.3d 1196, 1200 (11th Cir. 1997).

We agree with the district court's conclusion that the loss caused by Defendant's fraud had not been adequately taken into account by the Guidelines. During sentencing, the district court concluded that an enhancement based on the *monetary* loss caused by the Defendant's conduct was improper.[4] That conclusion, however, does not mean that Defendant's fraud did not cause harm or create loss: as the district court noted, fraud against government regulatory agencies does pose a threat of harm to the public. We conclude, therefore, that the district court did

---

[4]The government had argued before the district court that Defendant's offense level should be increased by the amount of loss his fraud caused, under Section 2F1.1(b)(1). The district court, however, rejected the government's argument, concluding that the "victims" of Defendant's fraud were federal and state regulatory agencies, and that the harm to those agencies was either extremely difficult or impossible to calculate in concrete terms. The district court further concluded that it was inappropriate to substitute Defendant's gain as a proxy for loss, because no connection existed between Defendant's gain and the agencies' loss. We express no opinion on the correctness of that conclusion.

13

not abuse its discretion in determining that Defendant's acts in this case were outside the heartland of typical fraud cases and in departing upward from the applicable sentencing range. [5]

Nor did the district court abuse its discretion in calculating the amount by which to depart from the guideline range. In making this decision, the district court did rely upon the government's calculation of Defendant's gain from his fraud and increased Defendant's sentence using the fraud table from Section 2F1.1(b)(1). The amount by which a district court departs from the Guidelines need only be reasonable. See Melvin, 187 F.3d at 1322. In Andersen, the Seventh Circuit wrote, in dicta, that "in calculating the extent of any departure, the net profits earned by the defendants, together with all other relevant information, would not be inappropriate matters for consideration." Andersen, 45 F.3d at 222. We agree with this statement, and therefore accept that the sentence imposed by the district court was reasonable and within the district court's discretion.

AFFIRMED.

---

[5]We note that this approach has been endorsed, in dicta, by the Seventh Circuit. See Andersen, 45 F.3d at 222. In Andersen, the court reversed an increase in offense level under Section 2F1.1(b)(1) on the basis of financial loss, because the harm caused by defendant's acts was non-monetary. But the court also wrote that, upon remand, "upward departure may certainly be warranted by the non-monetizable risk to human and animal health caused by the defendants' failure to follow" applicable regulations and procedures. Id.