[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 29, 2005
THOMAS  K. KAHN
CLERK

No. 04-14658
Non-Argument Calendar

_____

D. C. Docket No. 03-00127-CR-O4-LAC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ROBERT PETTWAY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(April 29, 2005)

Before HULL, WILSON and FAY, Circuit Judges.

PER CURIAM:

Robert Pettway was convicted by a jury of conspiracy to possess with intent to distribute 5 or more kilograms of cocaine and 50 or more grams of cocaine base in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii), (iii), and 846. On appeal, he argues that the district court erred by permitting him to represent himself at trial, abused its discretion by refusing to dismiss the indictment based on improper grand jury testimony, and is entitled to a new trial because the government violated its discovery obligations under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). For the reasons set forth more fully below, we affirm Pettway's conviction.

A grand jury indicted Pettway based on the testimony of Detective Steven Bauer, who testified that a group of individuals, including Pettway, a/k/a "Little Robert," resided at and sold drugs in a housing area known as "Warrington Village" in Pensacola, Florida. Bauer testified that the group was known as the "Warrington Celebrities," because they picture themselves as a rap group, but their mainstay was drugs. Bauer further testified that several of the group's members had already been arrested and had cooperated with the government's investigation, leading to several more arrests.

Bauer indicated that Pettway's role in the conspiracy was to accompany one of the codefendants to Atlanta in order to purchase anywhere from three to four

2

kilograms of cocaine from an unidentified source and bring it back to Pensacola. The cocaine would then be broken down and distributed to other members. Bauer's testimony was based on the testimony of other defendants who had been convicted and were cooperating with the government, as well as several street informants and police reports.

After Pettway had been detained, the government filed a notice of penalty enhancement under 21 U.S.C. § 851 based on Pettway's four prior state felony convictions for possession, sale, and/or delivery of controlled substances. At his arraignment and detention hearing before a magistrate judge, Pettway, after being advised that he had a right to an attorney and warned of the possible consequences of proceeding pro se, chose to represent himself, refusing the court's appointment of counsel. In addition, the government advised Pettway of the charge that he faced, including the mandatory life sentence if convicted, and was disadvantaging himself by waiving his right to a lawyer, all of which Pettway confirmed that he understood. Pettway, after having the indictment read to him, pled not guilty.

Although he was again appointed counsel, Pettway filed a pre-trial motion to represent himself at trial pursuant to Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The district court then conducted a Faretta hearing, where it first asked Pettway why he was seeking to represent himself, to which

Pettway responded:

> I feel like I would be more persuasive to the jury in presenting my evidence than [my attorney] will. [My attorney] is not working in my best interest. He was appointed by [you]. If anyone he needs to be representing, it's[you], sir, not me. I mean we have a conflict of interest. He is not working in my best interest. No attorney that I think that you would present to me or in my behalf will represent to the best of my ability, I mean, to help me.

After the court advised Pettway that his understanding of the appointment procedure was flawed, in that the public defender who would be appointed is an "independent operation,"Pettway reiterated twice that he wanted to represent himself in order to have a fair trial, and that he understood that he was facing a life sentence for the charges filed against him. The court told Pettway that it had a duty to ensure that Pettway understood the consequences of representing himself, and questioned Pettway about his education, to which Pettway indicated that he had a GED, and further indicated that he had gone to trial on a previous occasion and won. Pettway indicated that, at his previous trial, he had been appointed a public defender who did nothing for him, and had it not been for Pettway's own actions, he would have lost that trial. The court further asked Pettway if he was familiar with the expression that a person who represents himself has a fool for a client, to which Pettway responded he was not a fool, and was there to represent himself to the best of his ability. The government had no suggestions for the court,

4

and left the legal determination of Pettway's capability for self-representation to the judge. After advising Pettway that his request to represent himself was "the silliest thing" Pettway had ever done, the court granted the motion. Pettway then requested standby counsel, to which the court responded: "Mr. Pettway, you need to get it straight here. You told me you would not trust anyone that I appointed, so I'm not going to appoint standby counsel for you." Pettway responded that the court just didn't want him to have a fair trial, and that it was "all gravy as long as everything is on the record. Whether I lose or not, I have a good grounds for appeal." Pettway's appointed attorney was excused from any further responsibility. Pettway also requested discovery from the government, which indicated that it had given everything it was required to provide to Pettway's appointed counsel. His former counsel indicated that he would deliver all discovery to Pettway.

Relevant to Pettway's appeal, Bauer admitted at trial that he had misstated to the grand jury that Pettway was part of a rap group known as the "Warrington Celebrities," and explained that the "Warrington Celebrities" were also known as a group involved in a drug conspiracy, with some members being actual rappers and others being mere associates. Bauer explained that his grand jury testimony referred generally to the "Warrington Celebrities," and that a significant number of

5

that group were rappers, even if Pettway himself was not.

Bauer further admitted that, at the time he testified before the grand jury, it was believed, based on information he had, that Pettway was making trips with Jafari Williams to Atlanta, but he no longer believed that to be the case. Instead, he testified at trial that he had interviewed Williams, and discovered that Pettway did not travel with Williams, but rather was present when Williams returned from Atlanta, purchased cocaine in quantities of up to one quarter kilogram, and "cooked" it into cocaine base. No other trial testimony is relevant to Pettway's appeal, as he does not challenge the sufficiency of the evidence to convict him.

The government closed its case, Pettway presented no witnesses and did not testify on his own behalf, and the jury returned a verdict of guilty on the sole count of the indictment, finding that Pettway had conspired to possess with the intent to distribute 5 kilograms or more of cocaine and 50 grams or more of cocaine base.

Prior to sentencing, Pettway moved for and received an appointment of counsel. At sentencing, Pettway moved to dismiss the indictment on grounds of prosecutorial misconduct. Pettway argued that the government had failed to provide to him interview notes with someone named Grimsley, referenced in the pre-sentence investigation report created by the United States Probation Office, which Pettway argued was relied upon by Bauer when he testified before the grand

6

jury. Pettway argued that the substance and notes of Bauer's interview with Grimsley had not been provided to him in violation of Brady or the Jencks Act. He further argued that Grimsley's information could have been used to impeach Bauer's trial testimony regarding the grand jury proceedings.

The government responded that Bauer's inconsistent testimony had been dealt with during the trial, and that Pettway was failing to appreciate the distinction between interviews and actual statements. Pettway conceded that the government was not compelled, under the Jencks Act, to provide typed notes of interviews where the prosecutor was not even present, but that here, the failure to produce them prejudiced his defense.[1] He further argued that Bauer's testimony to the grand jury incorrectly associated him with the "Warrington Celebrities," incorrectly accused him of traveling to Atlanta to purchase drugs, and provided no other reliable evidence of any wrongdoing attributable to Pettway.

In response, the government argued that the trial evidence cured the admitted inaccuracy of Bauer's grand jury testimony, and that the "Warrington Celebrities" included not just a rap group but a drug-dealing group. As to the interview statements, the government stated that it had never seen them, and that

[1] The Jencks Act, 18 U.S.C. § 3500, which was incorporated into Fed.R.Crim.P. 26.2 in 1979, provides that no statement of a government witness shall be the subject of discovery until said witness has testified on direct examination in the trial of the case. See also United States v. Jordan, 316 F.3d 1215, 1227 n.17 (11th Cir. 2003).

7

they apparently amounted to police reports based on witness interviews. Pettway replied that the defective indictment couldn't be cured at trial because "that's putting his Fifth Amendment rights cart before the horse," and if the indictment was defective, he should not have been charged in the first place.

The court denied Pettway's motion, and found that whatever false statement was made to the grand jury, there would have to be a showing of either wilfulness or negligence, which could not be met, and further found that it was unaware of any statement made and recorded that was not turned over to Pettway for use during the trial.

Pettway's first argument on appeal is that the district court improperly permitted him to represent himself at trial because he did not have extensive experience with the judicial process, did not have a clear understanding of the rules of evidence or procedure, did not have access to materials explaining those rules and procedures, and was denied standby counsel to assist with making objections.

"A district court's conclusion that a defendant's [Faretta] waiver is valid--that it is knowing, voluntary, and intelligent--is a mixed question of law and fact that we review de novo." United States v. Kimball, 291 F.3d 726, 730 (11th Cir. 2002). "In Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the Supreme Court determined that the Sixth Amendment affords criminal defendants

the right to defend themselves if they so desire." Id. (citation omitted). However, "before a defendant is allowed to waive the assistance of counsel, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." Id. (citation and quotation omitted). The ideal method for assuring a valid waiver is for a district court to hold a Faretta hearing to "inform the defendant of the nature of the charges against him, possible punishments, basic trial procedure and the hazards of representing himself." Id.

The following factors are especially important to a determination whether a defendant's decision to proceed pro se is valid:

> (1) the defendant's age, health, and education; (2) the defendant's contact with lawyers prior to trial; (3) the defendant's knowledge of the nature of the charges and possible defenses and penalties; (4) the defendant's understanding of the rules of evidence, procedure and courtroom decorum; (5) the defendant's experience in criminal trials; (6) whether standby counsel was appointed and, if so, the extent to which standby counsel aided in the trial; (7) any mistreatment or coercion of the defendant; and (8) whether the defendant was attempting to manipulate the trial.

Id. at 730-31 citing Fitzpatrick v. Wainwright, 800 F.2d 1057, 1065-67 (11th Cir. 1986). Not all the factors must point toward waiver for the waiver to be valid. United States v. Strozier, 926 F.2d 1100, 1105 (11th Cir. 1991). Finally, the "purpose of a Faretta inquiry is not to determine the extent of a defendant's legal

9

knowledge or to determine how good of a trial advocate a defendant will be."

Kimball, 291 F.3d at 731. Thus, with respect to factors four and five, we need only determine "whether [the defendant] understood that rules do exist to govern the procedure of a trial, the introduction of evidence and the behavior of advocates and to determine whether [the defendant] understood that he would be bound by those rules." Id.

Here, Pettway possessed a GED, and stated that he had previously witnessed, and been involved in, a court proceeding, where, according to him, he would have lost were it not for arguments he personally made to the judge. Pettway expressed an understanding of voir dire and jury selection, and stated that he didn't need his attorney and had been preparing his case. He understood that he was facing a life sentence, but reasoned that he wanted to have a shot at a fair trial and believed that no attorney appointed to represent him would work on his behalf, despite a misunderstanding of the appointment process, which was explained to him by the district court. The court further asked Pettway if he was familiar with the expression that a person who represents himself has a fool for a client, to which Pettway responded he was not a fool, and was there to represent himself to the best of his ability. Pettway further indicated that he understood that the Federal Rules of Criminal Procedure and Evidence would apply, but argued to the court that he

10

had not been provided with the books, and had no access to a library in jail.

Moreover, at his arraignment and plea hearing, the magistrate specifically informed Pettway that he was making a mistake by turning down the free legal assistance being offered him, and that if Pettway was attempting to "work the system in such a way that [he could] ultimately challenge what happens . . . based on the fact that [he was] incarcerated and couldn't prepare for trial, [he] brought that on [himself] because [he'd been] offered a free lawyer." At that same hearing, Pettway indicated that he understood the crime he was charged with, exercised his right to have the indictment read to him, and pled not guilty. Finally, despite having indicated at his Faretta hearing that it was his belief that no appointed attorney would work on his behalf, Pettway requested an appointment of standby counsel, which the court denied, stating: "Mr. Pettway . . . [y]ou told me you would not trust anyone I appointed, so I'm not going to appoint a standby counsel for you."

Based on the foregoing, the district court did not err by granting Pettway's motion for self-representation under Faretta. Pettway was 26-years old, in good health, and possessed a GED. He had previous involvement in the legal system, even testifying that he had helped win his own case in spite of having appointed counsel. He was aware that the Federal Rules of Criminal Procedure and Evidence

11

were going to be used and that he was bound to follow them. Pettway was aware that he faced a life sentence for the conspiracy charge he faced, and had been warned by both the magistrate and the district court that he was making a mistake by choosing to forego his right to an attorney. There is no evidence that Pettway was mistreated or coerced, and, if anything, both the magistrate and the district court went to great pains to dissuade Pettway from representing himself. The only factor weighing in favor of denying Pettway his right to proceed pro se was the district court's refusal to appoint standby counsel, but the court understandably denied that request, as Pettway had indicated that any attorney appointed to represent him would not work on his behalf. In any event, not all of the factors must point toward waiver for the waiver to be valid. Strozier, 926 F.2d at 1105. Thus, we discern no error in permitting Pettway to represent himself at trial.

Next, Pettway argues that the grand jury proceedings were substantially influenced by the false testimony of Detective Bauer, and that but for the false testimony, the grand jury had no evidence implicating Pettway in the conspiracy and would not have indicted him. He argues that, regardless of what the government presented at trial, the indictment was compromised and unfair, and should have been dismissed.

We review the denial of a motion to dismiss an indictment for abuse of

12

discretion.  United States v. Pielago, 135 F.3d 703, 707 (11th Cir. 1998).  As a general rule, district courts "may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendant[]."  Bank of Nova Scotia v. United States, 487 U.S. 250, 254, 108 S.Ct. 2369, 2373, 101 L.Ed.2d 228 (1988).  Thus, an indictment should be dismissed only "if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations."  Bank of Nova Scotia, 487 U.S. at 256, 108 S.Ct. at 2374 (quotations and citation omitted).  We have further indicated that " the possibility that a witness may have given false testimony before the grand jury does not automatically vitiate an indictment based on that testimony; to dismiss an indictment the district court must also find an abuse of the grand jury process such as perjury or government misconduct."  United States v. DiBernarndo, 775 F.2d 1470, 1475 (11th Cir. 1985).

Before the grand jury, Bauer, relying on information received from co-conspirators, some of whom had not yet been arrested, testified that a group known as the "Warrington Celebrities," so named because they picture themselves as a rap group, were dealing drugs.  Bauer testified that one of the members of the "Warrington Celebrities" was Jafari Williams.  He further testified that Pettway

13

had traveled to Atlanta with Williams to purchase cocaine. After the cocaine had been obtained, Bauer testified that Pettway would "come back and get his cut, also help them break down the cocaine." At trial, Bauer specifically stated that, at the time he testified before the grand jury, he believed, based on information he had, that Pettway had traveled to Atlanta with Williams to purchase cocaine, and that after interviewing Williams, he discovered that this was not the case. The government has conceded that this portion of Bauer's grand jury testimony was incorrect.

However, Pettway did not, and has not, adduced anything to even suggest Bauer knew the statements were false when he made them, and therefore, has failed to show that the statements before the grand jury amounted to perjury. See United States v. Haimowitz, 725 F.2d 1561, 1580-81 (11th Cir. 1984) (holding that one of the elements to a perjury charge is that the person know that the statement was false when given). To the contrary, Bauer admitted that his statement was based on information he had at the time, which later turned out to be incorrect.

Moreover, Bauer's testimony before the grand jury also indicated that Pettway would "get his cut" and help "break down the cocaine." Regardless of whether he traveled to Atlanta, Pettway's purchase and assistance in breaking down the cocaine implicated him in the conspiracy, and thus, adequate evidence

14

supported the indictment independent of any erroneous testimony given by Bauer. Therefore, we conclude that the district court did not abuse its discretion by refusing to dismiss the indictment.

Lastly, Pettway argues that the government possessed statements of four individuals from interview notes that were delivered to the United States probation office for preparation of the PSI, but were not disclosed to him. He further argues that the government possessed and destroyed a tape recording of a drug transaction without giving him the benefit of hearing the contents. Pettway argues that the above evidence may have contained exculpatory remarks that he could have used during cross-examination or as impeachment.

First, the Jencks Act, 18 U.S.C. § 3500, "the substance of which was incorporated into Fed.R.Crim.P. 26.2 in 1979, provides that no statement of a government witness shall be the subject of discovery until said witness has testified on direct examination in the trial of the case. 18 U.S.C. § 3500(a)." Jordan, 316 F.3d at 1227 n.17. "Statement" is defined narrowly to include:

> (1) a written statement that the witness makes and signs, or otherwise adopts or approves;

> (2) a substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in any recording or any transcription of a recording; or

> (3) the witness's statement to a grand jury, however taken or recorded,

15

or a transcription of such a statement.

See Fed.R.Crim.P. 26.2(f)(1)-(3); 18 U.S.C. § 3500(e). Furthermore, under Fed.R.Crim.P 16(a)(2),[2] the interview summaries made by the government agents[are] exempt from discovery. See Jordan, 316 F.3d at 1227 n.17.

Under Brady, the government's obligation is slightly different, and the prosecution is required, upon request, to disclose evidence material to guilt or punishment that is favorable to the accused. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963). Impeachment, as well as exculpatory evidence, is included within the Brady rule. United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985).

While Pettway argues a Brady violation on appeal, it appears that his Brady challenge is raised for the first time on appeal, as it was not properly preserved below. The objection Pettway made in the district court was that the government had in its possession, and failed to provide to Pettway, notes of witness interviews conducted by government agents that were provided to the probation office, and the failure to provide him those notes should result in a dismissal of his indictment, not, as he argues on appeal, that he should receive a new trial. These notes of interviews, without showing more, were exempt under the Jencks Act from

---

[2] Entitled "Discovery and Inspection Information Not Subject to Disclosure."

16

discovery, and Pettway made no Brady showing to the district court, which, accordingly, found that the government had turned over all "statements" in its possession, a finding consistent with the Jencks Act. Thus, the relief Pettway sought - a dismissal of his indictment - was properly denied, as were his requests for discovery.

Therefore, we conclude that Pettway is arguing for the first time on appeal that he should receive a new trial because the government violated Brady when it failed to provide him interview notes that were used by the probation office to create a pre-sentence investigation report. Pettway did not request a new trial in the district court based on an alleged Brady violation, and, therefore, we will review for plain error only. See, e.g., United States v. Bender, 290 F.3d 1279, 1284 (11th Cir. 2002) (internal quotation and citation omitted) ("[i]f, however, the defendant did not precisely articulate a Brady violation in his or her motion for new trial, this court need only conduct a plain error review.").

To satisfy plain error review, an appellant must show there was (1) an error (2) that is plain (3) that affects the appellant's substantial rights and (4) affects the fairness and integrity of the judicial proceedings. United States v. Olano, 507 U.S. 725, 732, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993).

Assuming without deciding that the evidence Pettway relies upon for his

17

Brady claim satisfies prongs (1) and (2) under the plain error test, he has failed to show how the non-disclosure of the evidence affected his substantial rights. As this Court has noted, in evaluating the materiality of evidence under a Brady claim, a defendant must "convince us that there is a reasonable probability that the result of the trial would have been different if the [allegedly suppressed items] had been disclosed to the defense. In other words, the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Johnson v. Alabama, 256 F.3d 1156, 1189 (11th Cir. 2000).

While the notes themselves do not appear in the record on appeal, the contents of those notes were, according to Pettway, used by the probation office when creating its pre-sentence investigation report. Specifically, Pettway claims that the government possessed statements of Joseph Grimsley, Terry Newkirk, James Warren, and Edward Newell that may have contained impeachment evidence or exculpatory remarks. He offers, however, nothing more than his conclusory assertion that this is true, and does not direct our attention to a single statement, remark, or aside that would call into doubt the outcome of the case or shed doubt on Pettway's participation in the conspiracy. To the contrary, the PSI's use of the statements merely outlined the nature and participants of the conspiracy,

18

including Pettway's role as a low-level distributor and "cook." If anything, the statements are inculpatory, not exculpatory, and most likely did not require disclosure under Brady. However, even if they should have been disclosed, nothing in those statements places the case in such a different light so as to undermine confidence in the verdict, and thus, the failure to sua sponte order a new trial was not plain error.

Pettway also alleges that the government destroyed an audio tape "of a drug transaction" before he had an opportunity to listen to the tape. He believes the tape would have proven that he did not sell any drugs to a confidential informant. Pettway did not raise this claim in the district court, and there does not appear to be any evidence, outside of Pettway's assertion, that such a tape even existed. Pettway does not indicate who was recorded on that tape, nor does he suggest that it was he who was recorded transacting drugs with a confidential informant. If the contention is that it was not Pettway recorded on the tape, it does not make the tape exculpatory, as a jury convicted him without the benefit of the tape. If, on the other hand, the tape recorded Pettway transacting drugs with a confidential informant, the tape could only be inculpatory and not subject to Brady. In any event, the tape was not presented to the jury, nor was it referenced during the trial, begging the question whether it even existed in the first place. However, like the

19

notes relied upon by the probation office, whether this tape existed or not, the failure of the government to disclose it does not undermine confidence in the verdict.

Therefore, we conclude that it was not plain error for the district court to refuse to grant <u>sua sponte</u> a new trial based on Pettway's alleged <u>Brady</u> violation, and this Court should affirm.

In light of the foregoing, we conclude that the district court did not err by permitting Pettway to represent himself, did not abuse its discretion by refusing to dismiss the indictment, and did not plainly err by failing <u>sua sponte</u> to find a <u>Brady</u> violation. Therefore, we affirm Pettway's conviction.

**AFFIRMED.**