**[DO NOT PUBLISH]**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE ELEVENTH CIRCUIT**

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 20, 2005
THOMAS K. KAHN
CLERK

_____

**No. 05-10006**
**Non-Argument Calendar**

_____

D. C. Docket No. 03-20374-CR-JAL

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JEROME MCKENZIE,
a.k.a. McKenzie Jerome,

Defendant-Appellant.

_____

**Appeal from the United States District Court**
**for the Southern District of Florida**

_____

**(December 20, 2005)**

Before DUBINA, HULL and WILSON, Circuit Judges.

PER CURIAM:

Jerome McKenzie appeals his convictions and combined 35-month sentence

on 11 counts of bringing aliens into the United States without prior official authorization, in violation of 8 U.S.C. § 1324(a)(2)(A) and 18 U.S.C. § 2.[1] McKenzie, who represented himself during the majority of his seven-day jury trial, raises two distinct challenges to his convictions. First, McKenzie claims that his Sixth Amendment right to confrontation was violated when, at trial, the Government introduced through a special agent incriminating statements made by an alien who had already been repatriated. Second, McKenzie argues that the district court erred in granting his request during trial to proceed pro se, because he believes his waiver of the right to counsel was not made voluntarily and intelligently. In addition, McKenzie attacks his sentence on the grounds that it was enhanced under a mandatory United States Sentencing Guidelines ("Guidelines") regime based upon facts that were neither admitted by him nor found by a jury, in violation of *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005). We affirm McKenzie's convictions, but vacate his sentence and remand for resentencing.

## I. BACKGROUND

On the evening of February 5, 2003, while patrolling North Biscayne Bay in Miami-Dade County, Florida Fish and Wildlife Conservation Officer MacArthur

---

[1] Although the briefing generally refers to Appellant as "McKenzie Jerome," we refer to him as "Jerome McKenzie" due to the styling of this case.

Clark noticed a 25-foot motorboat near Baker's Haulover Inlet, which is one of two passages in the area from the Atlantic Ocean into Biscayne Bay. The motorboat was not displaying any navigational lights, and Clark proceeded to stop the vessel. Onboard were McKenzie, who identified himself as the boat's captain, and 11 passengers. Although Clark did not board the motorboat, his verbal interaction with McKenzie and the passengers, as well as the surrounding circumstances, caused Clark to suspect that the passengers were being smuggled into the United States. He therefore summoned the United States Coast Guard, which then boarded McKenzie's motorboat. Neither McKenzie nor the passengers possessed any form of identification, and only McKenzie spoke English.

According to Coast Guard Officer David Allen, McKenzie claimed that the passengers were family visiting from New York, but could not recall their names. Nor could McKenzie describe the boat's point of origin or destination marina. McKenzie also claimed that the passengers were present to help him clean fish, and a cooler on board did contain gutted fish. These fish, however, were at least partially frozen and did not appear to have been freshly caught. Furthermore, no knives or fish cleaning equipment were found on the motorboat. Two fishing poles were discovered, but were still wrapped in plastic from a store. Other items recovered from the motorboat included a Bahamian shopping bag, soda bottle, and

phone card, as well as Haitian money.

Coast Guard Special Agent James White later interviewed the passengers, with the assistance of a Creole translator. Almost all of the passengers, who were from Haiti, claimed to have been out fishing on the day in question. According to Agent White, however, passenger Beniel Vincent disclosed that he had taken a sailboat from Port-au-Paix, Haiti, to an island that he thought was in the Bahamas chain. Three days later, a man named "John" picked him up and brought him to the United States. Vincent identified McKenzie as "John."

An immigration check of the passengers disclosed that none of the 11 passengers had ever been to the United States or applied for entry, and all were repatriated. A grand jury later charged McKenzie with 11 counts of bringing unauthorized aliens into the United States, in violation of 8 U.S.C. § 1324(a)(2)(A) and 18 U.S.C. § 2. After developing numerous conflicts with multiple appointed defense counsel, McKenzie waived his right to counsel and proceeded pro se for the majority of his jury trial. He was convicted on all 11 counts, and later sentenced to a combined total of 35 months.[2]

## II. DISCUSSION

---

[2] McKenzie was represented by counsel during sentencing. A mental evaluation of McKenzie performed after trial revealed that he suffered from a personality disorder, but ultimately determined that he was competent to stand trial.

A.      *Sixth Amendment Right to Confrontation*

At trial, the district court permitted Special Agent White to testify in detail about the statements made by Beniel Vincent implicating McKenzie. McKenzie had sought to preclude the admission of this evidence on the grounds that Vincent, having been repatriated, would be unavailable for cross-examination, and that McKenzie had a constitutional right to confrontation. The district court found that Vincent's statements could be admitted under Federal Rule of Evidence 804(b)(3), as statements against penal interest. McKenzie argues that this was error under *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

We review a preserved constitutional issue de novo, but will reverse only for harmful error. *United States v. Nealy*, 232 F.3d 825, 829 (11th Cir. 2000). *Crawford* holds that "[w]hen testimonial evidence is presented against a defendant at trial, the Sixth Amendment right of confrontation cannot be denied unless the witness is unavailable and the defendant had a prior opportunity to cross-examine him." *United States v. Chau*, 426 F.3d 1318, 1321 (11th Cir. 2005) (per curiam). The Government concedes on appeal that the admission of Special Agent White's testimony regarding Vincent's statements violated *Crawford*, but contends that the error was harmless in light of the all the other evidence against McKenzie.

A constitutional error must be disregarded if the error is harmless beyond a

5

reasonable doubt. *United States v. Candelario*, 240 F.3d 1300, 1307 (11th Cir. 2001). In other words, we must ask: "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" *Neder v. United States*, 527 U.S. 1, 18, 119 S. Ct. 1827, 1838, 144 L. Ed. 2d 35 (1999); *cf. United States v. Harriston*, 329 F.3d 779, 789 (11th Cir. 2003) (per curiam) (stating that error was harmless where there was overwhelming evidence of guilt). Here, we believe the Government has established beyond a reasonable doubt that a rational jury would have convicted McKenzie even in the absence of Special Agent White's testimony about Vincent's statements.

The evidence presented at trial that McKenzie violated 8 U.S.C. § 1324 was, even when Vincent's statements are disregarded, overwhelming.[3] When Officer Clark encountered McKenzie, McKenzie was piloting a 25-foot motorboat in one of two passages in the area from the Atlantic Ocean into Biscayne Bay. It was evening, but McKenzie's boat was not displaying navigational lights. Although McKenzie was unable to describe a point of origin or destination marina, the GPS unit onboard his craft suggested that it had traveled that day from South Florida to

---

[3] Section 1324 prohibits any person, "knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to . . . the United States," from bringing or attempting to bring to the United States such alien. 8 U.S.C. § 1324(a)(2)(A).

Bimini and back, arriving in Biscayne Bay where it was intercepted by Clark. Numerous items seized from the vessel had Bahamian markings. None of the 11 passengers onboard spoke English or had a form of identification. Although McKenzie claimed that they were family, he could not seem to recall their names. He asserted that the passengers were onboard to help him clean fish (as did the passengers), but no knives or other fish cleaning equipment was located on the boat.[4] A cooler containing gutted fish was found, but the fish were partially frozen and did not appear to have been freshly caught. Fishing poles recovered from the boat were still wrapped in plastic from the store. An immigration check ultimately established that none of McKenzie's 11 passengers had been in the United States or applied for entry, and they were repatriated. Finally, Haitian national Enoch Theogene, who was in federal prison on drug charges, testified McKenzie had revealed to him in prison that McKenzie smuggled aliens into Miami, usually from the Bahamas. According to Theogene, McKenzie claimed to have been paid $6,000 to bring passengers to Miami. Given the overwhelming nature of the evidence presented against McKenzie at trial, the *Crawford* error created by the admission of Beniel Vincent's testimony was harmless beyond a reasonable doubt.[5]

---

[4] McKenzie apparently testified that he and the passengers had been cleaning fish, and that a Coast Guard officer took away their fish cleaning equipment when they were intercepted.

[5] In his reply brief, McKenzie argues that the Government's reliance on Vincent's statements in its closing arguments magnified the gravity of the *Crawford* violation. One of our

B.      *Waiver of Right to Counsel*

McKenzie next asserts that the district court erred in permitting him to represent himself at trial. Pointing to his numerous pro se motions for new counsel, distrust of lawyers, post-trial diagnosis with a personality disorder, and the factors set forth in *Fitzpatrick v. Wainwright*, 800 F.2d 1057, 1065-67 (11th Cir. 1986), McKenzie argues that he did not knowingly, voluntarily, and intelligently waive his right to counsel during trial. We disagree.

"Whether there has been an adequate waiver of the constitutional right to counsel depends upon the particular facts and circumstances of each case, including the background, experience, and conduct of the accused." *United States v. Cash*, 47 F.3d 1083, 1089 (11th Cir. 1995). However, "before a defendant is allowed to waive the assistance of counsel, he 'should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open.'" *United*

---

sister circuits has stated that the Government's "exceptional emphasis" on an offending hearsay statement during closing arguments, particularly in a rebuttal argument, "might in some cases tip the balance in a harmless error review." *United States v. Summers*, 414 F.3d 1287, 1304 (10th Cir. 2005). This is so, the panel reasoned, because "in emphasizing an inculpatory hearsay statement, the government might relieve the jury of its duty to find a defendant guilty beyond a reasonable doubt." *Id.* As McKenzie demonstrates, the Government's reliance on Vincent's testimony during its initial closing argument and in rebuttal was more than minimal. Nevertheless, we do not believe that this, when considered in the overall circumstances of the case and the facts presented at trial, tips the balance of harmless error review in McKenzie's favor.

*States v. Kimball*, 291 F.3d 726, 730 (11th Cir. 2002) (per curiam) (quoting

*Faretta v. California*, 422 U.S. 806, 835, 95 S. Ct. 2525, 2541, 45 L. Ed. 2d 562

(1975) (internal citation and quotations omitted)). A district court's determination

that such a "waiver is valid–that it is knowing, voluntary, and intelligent–is a

mixed question of law and fact that we review de novo." *Id.* On direct appeal, the

Government bears the burden of proving the validity of a waiver of the right to

counsel. *Brewer v. Williams*, 430 U.S. 387, 404, 97 S. Ct. 1232, 1242, 51 L. Ed.

2d 424 (1977).

Prior to trial, McKenzie achieved the withdrawal of one appointed

counsel–and sought the discharge of another–by means of pro se motions

expressing his dissatisfaction with counsel and requesting new representation, or

the right to self-representation. In the hearing on McKenzie's second motion for

alternate counsel, however, McKenzie ultimately relented and decided to keep that

counsel, Steve Chaykin. As trial approached, Chaykin advised the district court

that significant differences had arisen between McKenzie and Chaykin on how the

trial ought to be conducted, differences that might eventually prevent Chaykin

from continuing as McKenzie's counsel. McKenzie expressed a desire for more

control over Chaykin's decisions about how to proceed, but agreed to back off a bit

when the district court advised that Chaykin had McKenzie's best interests at heart.

9

On the third day of trial, however, McKenzie complained to the court that Chaykin was not representing him properly.[6] McKenzie explained that he did not agree with Chaykin's cross-examination of Government witnesses, and that he (McKenzie) would rather represent himself than continue with another lawyer.[7] Chaykin offered to act as stand-by counsel. After a tangential exchange in which the district court warned McKenzie not to harass witnesses, the court placed McKenzie under oath and conducted a *Faretta*-type hearing.[8] It is uncontroverted that the court informed McKenzie about the nature of the charges against him, the maximum possible term of imprisonment (11 years), the disadvantages of self-representation, and the court's own belief that it was in McKenzie's best interest to be represented by an attorney. It is also uncontroverted that McKenzie indicated he understood the court's warnings, but nevertheless wished to waive his right to

---

[6] For example, McKenzie complained that he had told Chaykin to ask the court to order government witnesses to remain nearby after testifying. The court explained that Chaykin had in fact made the request, but the court had overruled it (apparently because Chaykin did not intend to call the witnesses in his case-in-chief).

[7] McKenzie stated: "I will do better than what he is doing. I don't want anybody else. I will risk my head on my own."

[8] While we have noted that the ideal method for assuring a valid waiver of the right to counsel is a *pretrial* hearing, we have also acknowledged that a waiver can be sustained even in the absence of *any* hearing. *See Cash*, 47 F.3d at 1088. Although McKenzie's *Faretta*-type hearing occurred *after* the start of his trial, he does not challenge his conviction on this basis.

counsel and represent himself.[9]

We have previously identified several factors that are particularly important to the determination of whether a defendant's decision to proceed pro se is valid:

> 1) the defendant's age, health, and education; 2) the defendant's contact with lawyers prior to trial; 3) the defendant's knowledge of the nature of the charges and possible defenses and penalties; 4) the defendant's understanding of the rules of evidence, procedure and courtroom decorum; 5) the defendant's experience in criminal trials; 6) whether standby counsel was appointed and, if so, the extent to which standby counsel aided in the trial; 7) any mistreatment or coercion of the defendant; and 8) whether the defendant was attempting to manipulate the trial.

*Kimball*, 291 F.3d at 730-31 (citing *Fitzpatrick*, 800 F.2d at 1065-67). As the Government demonstrates, these factors do not favor McKenzie's claim. Although McKenzie does come from a different country and cultural background, he concedes that he "did have basic understanding of the charges against him," and it is not disputed that he was aware of potential defenses to those charges. McKenzie contends he believed that he would actually face only 12 months of incarceration, but concedes the district court advised him that a total of 11 years' imprisonment was possible. McKenzie also notes that he had very little understanding of the rules of procedure and evidence. The relevant issue, however, is not whether

---

[9] "The closer to trial an accused's waiver of the right to counsel is, the more rigorous, searching, and formal the questioning of the trial judge should be." *Kimball*, 291 F.3d at 730. McKenzie does not claim that the district judge's questioning was lacking in any of these aspects.

McKenzie understood the technicalities of the rules themselves, but whether he understood that such rules existed and would bind him. *See id.* at 731. It is clear that McKenzie had some experience with the trial process, for he was tried and acquitted of aggravated assault with a weapon in 1997.[10] Moreover, it is uncontroverted that stand-by counsel Chaykin sought to assist McKenzie throughout the course of his trial,[11] and there is no claim that McKenzie was coerced or attempted to manipulate the trial.

McKenzie also claims that the adequacy of his waiver is called into question by the fact that a post-trial mental evaluation diagnosed him with a "Personality Disorder Not Otherwise Specified with Paranoid, Antisocial, and Narcissistic Features."[12] The evaluation tested, inter alia, McKenzie's ability to understand the

---

[10] It is not clear whether McKenzie represented himself during that trial.

[11] McKenzie notes that at one point Chaykin advised the district court of his (Chaykin's) belief that McKenzie's self-representation was a "disaster," and that "it has been virtually impossible for me to do anything to assist him in creating a defense." Whether McKenzie was receptive to Chaykin's advice, however, is an issue quite distinct from whether that advice was available to McKenzie throughout trial.

[12] After trial, the district court granted Chaykin's motion to withdraw as stand-by counsel and, at McKenzie's request, appointed him a new counsel to assist at sentencing. Unsurprisingly, McKenzie became dissatisfied with this counsel and requested yet another one. The district court granted the motion and appointed Ana Jhones to represent McKenzie. At the sentencing hearing, Jhones sought to withdraw, claiming that McKenzie was "not amenable to the advice of counsel" and had a paranoid distrust of lawyers. Noting the number of attorneys that had already cycled through the case, the district court denied the motion to withdraw, but acceded to Jhones's request for a competency evaluation of McKenzie. "Competency to waive the right to counsel is judged by the same standard as competency to stand trial." *Cash*, 47 F.3d at 1089 n.3.

12

charges against him, understand courtroom proceedings, and assist defense counsel. Although the evaluation report found that McKenzie had a "limited degree of trust" for defense attorneys, it also noted that he was of average intelligence, had completed formal schooling through the eleventh grade, demonstrated adequate knowledge of courtroom roles and proceedings, and "score[d] well within the ranges of persons competent to stand trial by the courts." While McKenzie displayed "characterological dispositions" that would "interfere in his interactions with others and with his perceptions of the legal process," these behaviors were merely "impediments to the ongoing process," not "products of a serious mental illness." Ultimately, the evaluation concluded, McKenzie had a "detailed understanding" of legal procedures, demonstrated "no impairment in his ability to assist towards his own defense, if motivated to do so," and should be considered competent to stand trial. Having considered the evaluation as a whole, we agree with the Government that McKenzie was competent to waive his right to counsel.[13]

"[T]he ultimate test for whether there has been a valid waiver of the right to

---

[13] McKenzie compares his case to *Cash*, which involved a defendant with a personality disorder somewhat similar to McKenzie's. *See* 47 F.3d at 1089. Unlike McKenzie, however, the defendant in *Cash* had very limited contact with defense counsel and received an inadequate *Faretta* hearing. *See* 47 F.3d at 1088-89 ("The court did not question Appellant regarding his knowledge of the charges and potential penalties he faced.").

counsel is not the trial court's express advice, but rather the defendant's understanding." *Cash*, 47 F.3d at 1088 (internal quotations omitted). Here, the record demonstrates that McKenzie was well aware of the risks posed by self-representation, and made the decision to proceed pro se "with open eyes." *See id.* The district court did not err in determining that McKenzie had knowingly, voluntarily, and intelligently waived his right to counsel.

As shown above, neither McKenzie's *Crawford* argument nor his challenge to waiver of the right to counsel warrants reversal or remand. Accordingly, we affirm his convictions.

C.    Booker *Challenge*

At sentencing, the district court, applying the Guidelines as mandatory, enhanced McKenzie's sentence based on findings of reckless endangerment and obstruction of justice. McKenzie contends that this violated his Sixth Amendment rights as set forth in *Booker*. *See United States v. Rodriguez*, 398 F.3d 1291, 1297 (11th Cir.) ("*Booker* [holds] that the Sixth Amendment right to trial by jury is violated where under a mandatory guidelines system a sentence is increased because of an enhancement based on facts found by the judge that were neither admitted by the defendant nor found by a jury.") (emphasis omitted), *cert. denied*, __ U.S. __, 125 S. Ct. 2935, 162 L. Ed. 2d 866 (2005). Because McKenzie raised

14

his constitutional objection before the district court, we review his sentence de novo, though we will reverse only for harmful error. *United States v. Paz*, 405 F.3d 946, 948 (11th Cir. 2005) (per curiam).

Here, the Government concedes that the district court committed constitutional *Booker* error when the court enhanced McKenzie's sentence based on facts that were neither admitted by McKenzie nor found by a jury. The Government further concedes that it cannot meet its burden of proving that the error did not affect McKenzie's substantial rights; that is, that the error was harmless beyond a reasonable doubt. *See id.* We therefore vacate McKenzie's sentence and remand for resentencing.[14]

**AFFIRMED IN PART, VACATED IN PART, and REMANDED.**

---

[14] The district court also committed statutory *Booker* error by sentencing McKenzie under a mandatory Guidelines regime. *See United States v. Mathenia*, 409 F.3d 1289, 1291 (11th Cir. 2005) (per curiam). As we have already determined that the case must be remanded for resentencing due to constitutional *Booker* error, however, we need not discuss the statutory error further.