[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-12596

_____

D.C. Docket No. 9:12-cr-80109-DTKH-1

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

MICHAEL JAMES MELILLO,

Defendant–Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(November 13, 2015)

Before JORDAN and JULIE CARNES, Circuit Judges, and RICHARD W. GOLDBERG,* Judge.

JULIE CARNES, Circuit Judge:

---

* Honorable Richard W. Goldberg, United States Court of International Trade, sitting by designation.

Defendant Michael Melillo pled guilty to one count of conspiracy to commit kidnapping. Prior to the sentencing hearing, Defendant's retained counsel requested that he be allowed to withdraw from representing Defendant, primarily because of the conflict between him and his client as to the most effective sentencing strategy. Defendant concurred with his attorney's request and asked that the district court appoint him new counsel. The district court did so and set a new sentencing date.

But then prior to this second scheduled hearing, Defendant and his appointed counsel petitioned the court to allow counsel to withdraw. Once again, Defendant and his attorney strongly differed on the wisdom of a strategy that Defendant insisted on pursuing at sentencing. Specifically, Defendant wanted to argue that he had been coerced into participating in the kidnapping conspiracy that he had admittedly devised. Once again, Defendant asked the district court to appoint him new counsel.

After a lengthy colloquy with Defendant and his counsel, however, the court found no good cause to appoint Defendant yet another attorney. Instead, the court directed that Defendant proceed with his present counsel. Defendant declined to do so and ultimately indicated that if the court would not provide him a new attorney, he wanted to represent himself at sentencing. Acquiescing to Defendant's request, the district court conducted a *Faretta* hearing to determine

whether Defendant understood the ramifications of this decision. Concluding that Defendant, who was himself an experienced civil litigator, had knowingly and intelligently waived his right to counsel, the court permitted him to proceed pro se. The Court, however, directed that his appointed counsel act as "standby" counsel to help Defendant, should the latter seek assistance.

Defendant represented himself at sentencing and, against both of his previous lawyers' advice, argued that he had been an involuntary participant in the kidnapping plot to which he pled guilty. The district court did not find Defendant's explanation believable and, in fact, concluded that Defendant had perjured himself. Further, because Defendant essentially accepted little to no responsibility for his criminal conduct, the court declined to award him the reduction permitted by the United States Sentencing Guidelines for a defendant who accepts responsibility.

On appeal, Defendant does not contest the validity of his plea or his conviction. Instead he complains that the district court erred by allowing him to represent himself, instead of appointing him a new attorney. Stated another way, he argues that the court's refusal to appoint him new counsel rendered unknowing and involuntary his waiver of counsel. As a remedy for this alleged error, Defendant seeks a new sentencing hearing. After careful review and oral argument, we conclude that the district court did not abuse its discretion, decline

3

Defendant's request for a new sentencing hearing, and affirm the sentence imposed by the district court.

## I. __FACTUAL BACKGROUND__[1]

In May 2012, two individuals, "Anna" and "Mario" showed up at the FBI Office in West Palm Beach, Florida, to report a crime planned by Defendant. Anna, who was involved in a romantic relationship with Defendant, stated that he had told her about his plan to kidnap someone. Concerned, Anna told Mario, who then spoke to Defendant and expressed his willingness to help. Defendant gave Anna and Mario identifying information about the intended victim, the latter's family, and another individual, Pavlos Kaimacliotis, who had been planning the kidnapping with Defendant, but whose interest had seemingly waned.

On May 10, during a phone call to Defendant monitored by the FBI, Mario arranged for Defendant to meet with someone who might be willing to help him carry out his kidnapping plan. This individual, identified as "David," was, in fact, an undercover FBI agent. The next day, Defendant and David met and Defendant stated that he and his erstwhile partner, Pavlos Kaimacliotis, had been planning the kidnapping for about a year and a half. Defendant explained that his initial motivation for the kidnapping had been to exact revenge against the intended victim, but he was now more motivated by the prospect of acquiring enough

---

[1] In entering his plea of guilty, Defendant stipulated that the Government could have proved at trial the facts set out in text.

4

money to allow him to obtain a good quality of life for him and his son.  He noted that he and Kaimacliotis had tried to hire someone to help execute the plan but could find no one reliable.  As to the plan itself, Defendant intended to ask for a $15 million ransom and, if the family initially refused to pay, he would then cut off the victim's fingers and send them to the family.  Defendant expressed uncertainty whether it would be better to kidnap this individual or his daughter, whom Defendant believed was married to a wealthy man from Switzerland.  After discussing other details, Defendant gave David $5,000 to get started on the plan and obtain more information about the victim.

Five days later, Defendant and David met again.  Defendant stated that the victim and his family were wealthy, and he believed they would pay the ransom.  To avoid detection, Defendant stated that he had purchased two untraceable cell phones that would be used during ransom negotiations.  Further, when the crime was completed, he intended to throw his iPad into the ocean, which would prevent anyone from using it to find search history concerning the kidnapping.  Defendant stated that he was prepared to kill the victim if that became necessary to avoid going to jail.  Finally, he acknowledged that he had been thinking about this plan for two years and was ready to execute it.

A week later, David called Defendant and told him the victim had been successfully kidnapped.  Meeting Defendant later in the morning, David showed

Defendant a staged photo of the victim, in restraints, holding that day's newspaper. David explained that the victim had spoken to his wife and the latter would be expecting a call from Defendant at 2:00 p.m. David gave Defendant a disposable phone to use, but, of course, that phone had been bugged by the FBI.

At 2:00, Defendant called the phone number David had given him and, believing he was talking to the victim's wife, demanded $20 million in exchange for the victim's release. Defendant was in fact talking to another undercover agent, not the victim's wife. Defendant then immediately called David and told him that he had demanded the $20 million ransom and that the "wife" was very upset. Two hours later, Defendant again telephoned the victim's wife and lowered the ransom demand to $16 million, but cautioned that he would cut off the victim's hand if she did not pay up. Defendant immediately called David to fill him in. An hour later, Defendant placed a third phone call to the victim's wife. The undercover agent portraying the wife told Defendant that she had come up with $12.5 million and could get it to him within an hour and a half. Defendant advised that he would call her back with further instructions.

Over the course of several more phone calls, Defendant and David finalized plans for the location of the ransom drop. Thereafter, Defendant instructed the wife to place the cash in the trunk of a vehicle at the Palm Beach International Airport. After the time set for the cash drop, Defendant and David drove to the

airport together to retrieve the car.  David drove from the airport in the vehicle containing the cash, while Defendant followed in his black Cadillac Escalade. When they arrived in the designated meeting spot, Defendant exited his vehicle and began what turned out to be a short-lived celebration that was interrupted by his arrest.

Kaimacliotis was arrested shortly thereafter.  He confirmed that he and Defendant had been discussing the latter's kidnapping plan for a year and a half. He further confirmed that he had been acting as a look-out for Defendant, who told him that Defendant and David had done the kidnapping and were about to collect several million dollars in ransom.

## II.  PROCEDURAL HISTORY

### A.  Retained Counsel Iacullo's Representation

In 2012, Defendant and co-defendant Pavlos Kaimacliotis were indicted for conspiracy to commit kidnapping and attempt to kidnap a person for ransom, in violation of 18 U.S.C. §§ 1201(c) and (d).  Represented by retained counsel from New Jersey, Anthony Iacullo,[2] Defendant subsequently pled guilty to the conspiracy charge.

The presentencing investigation report ("PSR"), prepared by the probation office, set Defendant's base offense level under the Guidelines at 32, pursuant to

---

[2]  Defendant hired Iacullo because a lifelong, close friend of Defendant's is a partner at Iacullo's New Jersey-based law firm.

7

U.S.S.G. § 2A4.1. It applied a six-level enhancement because a ransom demand was made and a two-level enhancement because Defendant was an organizer, leader, manager, or supervisor of the criminal scheme. *See* U.S.S.G. §§ 2A4.1(b)(1), 3B1.1(c). The PSR further recommended that Defendant receive a three-level reduction for his timely acceptance of responsibility. As calculated by the PSR, Defendant's total offense level was 37, with a criminal history category of I, which yielded an advisory Guidelines range of 210–262 months' imprisonment.

On March 1, retained counsel Iacullo wrote a letter to the probation officer, objecting to both enhancements. On March 26, Iacullo moved to continue the April 11 sentencing because he had trial conflicts in New Jersey and also because he needed more time to meet with Defendant and submit a sentencing memorandum. The court denied the motion.

Iacullo wrote to the prosecutor asking that the Government produce Anna and Mario, whom Defendant wanted to call as witnesses to challenge the six-level enhancement for demanding a ransom. Noting that Anna and Mario had merely reported the kidnapping plot and had no involvement after the FBI interceded, the Government opposed the request. The Government further explained that Anna was "frightened and reluctant to testify" because Defendant had allegedly threatened to find and kill her to prevent her from testifying. Further, in violation

of instructions that he not contact Anna, Defendant had written to her from prison, causing her even greater fear and anxiety.

On April 8, three days before sentencing, Iacullo filed a motion to withdraw as counsel. The court denied the motion. At the sentencing hearing on April 11, Iacullo renewed the motion, stating that his relationship with Defendant had "deteriorated to the point" that he "cannot in good faith and good conscience as to the best of my ability represent him." Noting that Defendant "requests that certain enhancements be challenged, contrary to the advice that I have provided," Iacullo explained that he could not honestly pursue such a strategy because he believed it would be harmful to Defendant. In fact, Iacullo stated that he had advised Defendant of the potential ramifications "once we proceed down a certain path" and that it could affect his acceptance of responsibility. Summing up the situation, Iacullo explained, "It's to the point, Judge, he doesn't have faith in the information and the relationship."

Confirming Iacullo's assessment of the broken relationship, Defendant justified his request that the court remove Iacullo as counsel on two grounds: their difference of opinion as to legal strategy and a total breakdown in communication.[3] Though Iacullo had not gone into detail regarding the precise disagreement about

---

[3] As to the lack of communication, Defendant told the court he had not seen Iacullo from the time of the change of plea hearing in January until the previous night. Further, he had not yet gone over the PSR with Iacullo.

strategy, Defendant filled in the blanks, explaining that he wanted to call Anna and Mario as witnesses to establish that Defendant had believed Mario to be part of the Russian mob, which would kill Defendant if he did not do exactly what Mario told him to do. Iacullo had apparently advised him that this was an unwise strategy that created a risk of losing the acceptance of responsibility reduction.

Now privy to all of the above information, the district court reconsidered its earlier decision and granted Iacullo's motion because "there has been a breakdown in trust, confidence and communication in large part simply because [] Mr. Iacullo is a very busy trial lawyer, who practices law at a distance." As to the Defendant and his lawyer's difference of opinion as to sentencing strategy, the court advised Defendant to consider the warning Iacullo had given him about the peril in pursuing a strategy that would undermine an argument that he had accepted responsibility for his actions.

The court then granted Defendant's request for appointed counsel, but made clear that Defendant would not be permitted to hand-pick his attorney and that the court did not intend to embark on a series of new-counsel appointments.[4] Pursuant

---

[4] In agreeing to appoint new counsel for Defendant, the court forewarned Defendant: "You understand that you can't pick your new lawyer and I'm not going to appoint a series of lawyers to represent you. You're going to have to take whoever I can get to represent you. I'll get a competent good lawyer to represent you."

to the Criminal Justice Act, 18 U.S.C. § 3006, the court appointed Randee Golder. A new sentencing date was set for May 21.

## B. Appointed Counsel Golder

Meeting with Defendant the same day she was appointed, Golder filed "Prior Counsel's Objections to the PSI." But within two weeks, on April 25, she too had moved to withdraw as counsel, asking the court to conduct a hearing to permit Defendant to proceed pro se. The motion explained that based on her initial two-hour meeting with Defendant, she realized that she would need to review the evidence and record and therefore immediately sought a copy of the evidence. Speaking to the prosecutor, the latter informed her that given the position reflected in Defendant's objections, the prosecutor might now object to any reduction for acceptance of responsibility. After reviewing the record and conducting research, Golder, like Iacullo before her, concluded that Defendant's sentencing strategy was not viable.

When Golder spoke with Defendant on the phone and explained her concerns, Defendant expressed annoyance that, like Iacullo, Golder disagreed with Defendant's approach. Greatly agitated by Golder's observation that his strategy was very flawed, Defendant requested that she withdraw as his attorney. Golder explained that she had spent extensive time working on his case and could not withdraw just because Defendant did not like the legal advice she was giving him.

11

Defendant became angrier, called Golder an ugly name, and said he wanted to represent himself. The motion stated that, given all the above, Golder felt she could no longer represent Defendant.

The district court held a hearing on Golder's motion on May 1. Addressing the court, Defendant remarked that Golder had only filed the motion because she was aware that Defendant had already sent a letter to the court asking it to dismiss Golder as his attorney and to permit Defendant to proceed pro se. Indicating that it had not yet received this letter, the court nevertheless permitted Defendant to make an oral motion. Defendant did so, requesting that he be allowed to proceed pro se, but conditioning that request on his being transferred to a federal detention facility with access to a law library. The court made clear that it had no control over Defendant's transfer to a different facility and, accordingly, it could not so condition its grant of Defendant's motion to proceed pro se. The court's explanation triggered repetitive and non-responsive statements by Defendant, always to the effect that he wanted to proceed pro se but that he also insisted on being transferred to a facility with a law library.

After the district court had patiently circled three times through the same discussion with Defendant, the latter relented on his conditional motion to proceed pro se, instead requesting that counsel be appointed to represent him at sentencing. Given this change of position by Defendant, the court asked Golder whether she

12

was insistent on pursuing her motion to withdraw as Defendant's attorney. Noting that she had been reluctant to file the motion in the first place, Golder responded that she was willing to represent Defendant at sentencing, if he was also willing. Defendant was not agreeable, immediately interjecting: "I am willing to go forward but not with Ms. Golder." He then requested that he be appointed new counsel.

At this point, the court closed the courtroom, sending out Government personnel and others, to inquire more specifically into Defendant's dissatisfaction with Golder. Defendant explained that when, at his initial meeting with Golder, he expressed his desire to challenge the two sentencing enhancements, Golder laughed at him. Defendant also stated that in a subsequent phone conversation, Golder told Defendant that his twenty-one page letter to the court, which primarily contained information about his "life and beliefs and [] faith and what I have become in my eleven months in jail," was "a bunch of bullshit." Finally, Defendant was upset that Golder had recounted the ugly name he called her and had not filed ex parte her motion to withdraw.

For her part, Golder explained that at the prosecutor's suggestion, she had listened to all of the recorded phone calls between Defendant, David, and the agent posing as the victim's wife, and she did not think Defendant's strategy of claiming duress could be pursued in good faith. The court reminded Defendant that Iacullo

had likewise cautioned him that challenging the two enhancements could lead to losing his acceptance of responsibility reduction. Noting that it had watched Golder practice for many years and that she was "a first class lawyer," the court denied Defendant's motion to be appointed different counsel.[5] It further reminded Defendant that under the law, he had no right to have a particular lawyer appointed for him or to demand that a different appointed lawyer be provided, absent a showing of good cause, which he had failed to make.

Given a choice between proceeding with Golder as his attorney and proceeding pro se, Defendant announced that he would represent himself. Reopening the proceedings to the prosecutor and others, the court reiterated the explanation it had earlier given in closed court that a court should only appoint substitute counsel when a defendant has demonstrated good cause to do so: a showing that Defendant had failed to make. Defendant then formally moved to be allowed to proceed pro se.

At that point, the court proceeded with the colloquy called for in *Faretta v. California*, 422 U.S. 806 (1975), to insure that Defendant's waiver of counsel was done knowingly and intelligently. As to both his ability to represent himself at

---

[5] Actually, the court initially stated that it was denying Golder's motion to withdraw. But Golder reminded the court that she had withdrawn that motion and that the actual motion before the court was Defendant's motion for new counsel. The court thanked Golder for the clarification and agreed that it was denying the motion for new counsel.

14

sentencing and his knowledge of what that might entail, Defendant advocated for self-representation by explaining that he had maintained an active civil litigation practice in New Jersey for thirty years, including extensive trial experience, and he had occasionally practiced in federal court. He explained that he was somewhat familiar with the Sentencing Guidelines and understood his potential sentencing range as well as the fact that he possibly faced a life sentence with no possibility of parole.

The court then walked Defendant through an explanation of the sentencing process and the Guidelines' role in that process. In particular, the court emphasized the consequence of the loss of an acceptance of responsibility reduction, reiterating that Defendant's pursuit of certain strategies at sentencing could be interpreted as a failure to accept responsibility and reminding him that Iacullo had expressed this same concern to Defendant. Defendant confirmed that he understood the tremendous responsibility he was undertaking and that the court could not assist him. He further acknowledged his awareness that he might not have access to a law library, but that he nonetheless wished to proceed pro se.

If the court's above advice had not been sobering enough, the district court concluded by stating, "I've told you in no uncertain terms that I think you are making a profound, profound mistake, and the consequences could be enormously serious to you. Do you understand that?" Defendant responded, "Yes, your

15

Honor," and then again expressed his desire to call as a witness at sentencing the person he alleged to be a member of the Russian mob:  Mario.

The court appointed Golder as standby counsel, and over the Government's objection, ordered the Government to produce Mario.

### C.  Defendant's Self-Representation at the Sentencing Hearing

With Golder sitting at defense table with him, Defendant represented himself at the sentencing hearing.  The record reflects that the district court listened patiently to Defendant as he went through his factual objections to the PSR, and that it even helped Defendant articulate some specific objections.  As to his Guidelines objections, Defendant objected to the six-level enhancement for the ransom demand and to the two-level enhancement for leadership role.  Regarding the former, Defendant argued that he should not receive this enhancement for two reasons:  (1) he had only demanded the ransom payment under duress and coercion and (2) because the Government could have arrested him before he made a ransom demand, its failure to wait until he actually carried out the scheme meant that it had entrapped him into demanding a ransom.

In support of his argument that he had made the ransom demand only under duress, Defendant testified that he believed Mario had ties to the Russian Mafia and that David, the undercover kidnapper, was one of Mario's Mafia associates. According to Defendant, Mario stated at their initial meeting that he was going to

16

take over the whole kidnapping scheme to protect Anna, Defendant's romantic partner. Mario not only threatened to kill Defendant if anything happened to Anna, but he also threatened to harm Defendant's family if Defendant did not do everything he was told to do. Defendant further testified that David also threatened him and, in particular, when Defendant said he did not want to be the one to make the ransom demand telephone call, David responded, "Well, if you don't make the calls, what do we need you for?" Defendant claimed that he understood this to be a threat that he would be killed if he did not make the calls.

Defendant's testimony was contradicted by that of Mario, whom Defendant had insisted on calling as a witness. Mario repeatedly denied having threatened Defendant in any way or having ordered Defendant to do anything. In fact, Mario testified that at their initial meeting, Defendant took control, as he "sat and bragged for thirty minutes about [his] brilliant plan." As to his feeling threatened by David, Defendant admitted on cross-examination that he discussed with David that he had "done his homework" on the victim and knew how much money they could get from him: assertions that hardly portrayed Defendant as a timid partner in the criminal enterprise.

The district court credited Mario's testimony and did not find believable Defendant's claim that he had been threatened by either Mario or David. It

17

therefore overruled Defendant's objection to the six-level enhancement for demanding a ransom.[6]

As to the two-level enhancement for Defendant's supervisory role over Kaimacliotis, Defendant argued that he had not recruited Kaimacliotis and that the latter had done almost all of the legwork for the kidnapping. According to Defendant, he and Kaimacliotis made mutual decisions, were going to split the profits of the kidnapping equally, and were equal partners in the scheme. Undercover agent David, however, testified that Defendant minimized Kaimacliotis' involvement in the planning. To the contrary, Defendant claimed he had done all of the background research on the victim and had orchestrated the plan. In fact, David was unaware that Kaimacliotis had reentered the picture until he and Defendant went to the airport to pick up the money and seeing Kaimacliotis, David asked who he was. Defendant responded that Kaimacliotis worked for him and was responsible for taking the ransom money to a warehouse in Riviera, Florida.

---

[6] Defendant fared no better in his argument that the Government had "entrapped" him into demanding a ransom because it could have arrested him before he made the call. The court concluded that there had been no outrageous conduct by the federal agents. To the contrary, undermining Defendant's claim that the Government had manipulated Defendant into demanding a ransom was the fact that Defendant admitted he had been planning the kidnapping for eighteen months and that the end goal of the kidnapping scheme was his receipt of a large ransom payment.

The court overruled Defendant's objection to the leadership enhancement. The court noted that it was Defendant, not Kaimacliotis, who had allegedly been aggrieved by the victim and who had sought revenge. Moreover, having listened to the recording of Defendant's conversation with David, the court had no doubt that Defendant was the driving force in the kidnapping plot. In fact, the court found incredible Defendant's version of events, which painted him as "a leaf [] being blown though this terrible criminal conspiracy at the whim of others."

Following the court's findings on the above objections, the Government asked the court not to give Defendant a reduction for acceptance of responsibility.[7] Finding that Defendant had perjured himself, the court agreed that Defendant was not deserving of this reduction. The court summed up its assessment of Defendant's lack of contrition: "[Y]ou have pled guilty, but you have done everything you can to shield yourself from an accurate evaluation of your criminal involvement in this."

The adjusted Guidelines range was 292 to 365 months' imprisonment. After considering all of the § 3553(a) factors, the court noted that Defendant's crime had not been impulsive, but instead arose out of a long period of planning. Moreover, the court concluded that Defendant would have used any means necessary to

---

[7] Given Defendant's perjurious testimony at sentencing, the Government also indicated that it had considered seeking an enhancement for obstruction of justice, but decided not to pursue this enhancement.

obtain the ransom money.  The court sentenced Defendant to 292 months' imprisonment.

## III.  DISCUSSION

### A.  Motion for Substitution of Counsel

As set out above, after the district court granted what was essentially a joint motion by Defendant and his retained counsel for the latter to withdraw, the court appointed new counsel.  Defendant was likewise displeased with newly-appointed counsel, and for the same reason he had been dissatisfied with retained counsel: both attorneys strongly advised Defendant against pursuing a sentencing strategy in which he refused to accept responsibility for his criminal acts, but instead blamed the kidnapping scheme on the Russian mob.  Both attorneys feared that Defendant's refusal to express contrition and fully acknowledge his wrongdoing would likely result in a higher sentence than might otherwise be imposed.

Defendant did not wait for his appointed counsel to bring matters to a head. Instead he wrote a letter to the court requesting that he be allowed to proceed pro se.  Appointed counsel Golder then filed a motion asking that she be allowed to withdraw from representation.  In support of that motion, she noted that Defendant had refused to consider her legal advice, had demanded that she withdraw, and had been verbally abusive toward her.

At the hearing on the above matter, Defendant took the initiative in asking to be allowed to represent himself and to be moved to a detention facility with a law library. It was only after the court advised Defendant that it could not insure that he would be transferred to such a facility that Defendant then asked, alternatively, that the court appoint a new, and now third, attorney to represent him at sentencing. In response to the court's inquiry, appointed counsel Golder indicated that she was willing to go forward with the representation of Defendant, if he would agree. But Defendant refused to accept Golder as his attorney. Finding no good cause to substitute different counsel for Defendant on the facts presented to it, the court denied Defendant's oral motion for a new attorney.

Defendant now argues that the district court erred when it refused to appoint new counsel to replace Golder. Defendant further argues that the court's refusal to provide him with a third lawyer entitles him to a new sentencing hearing before a different judge, at which hearing he should be appointed new counsel.

It is true that a defendant has an absolute right to counsel, but it is equally true that a defendant has no right to dictate who that appointed counsel will be. *Thomas v. Wainwright*, 767 F.2d 738, 742 (11th Cir. 1985). And a defendant who insists that a different lawyer be appointed must show good cause to support his demand. *United States v. Garey*, 540 F.3d 1253, 1263 (11th Cir. 2008) (en banc). Accordingly, absent such a showing, "defendants who lack the means to hire a

21

private attorney must either accept the counsel appointed to represent them or represent themselves." *Id.* at 1264.

Further, when a defendant expresses unhappiness with his court-appointed counsel and requests that the court appoint new counsel, that decision is left to the sound discretion of the district court. *United States v. Young*, 482 F.2d 993, 995 (5th Cir. 1973) ("Unless a Sixth Amendment violation is shown, whether to appoint a different lawyer for an indigent criminal defendant who expresses dissatisfaction with his court-appointed counsel is a matter committed to the sound discretion of the district court.").[8]  For that reason, we review a district court's ruling on a defendant's motion for appointment of different counsel for abuse of discretion. *United States v. Calderon*, 127 F.3d 1314, 1343 (11th Cir. 1997).

In deciding whether a district court has abused its discretion, we look to the timeliness of the motion, the adequacy of the district court's inquiry, and the merits of a defendant's claim that counsel should have been replaced. *Id.*  Further, even if the district court has abused its discretion by denying a defendant's motion for substitute counsel at a sentencing hearing, the defendant must show that counsel's continued representation of him caused prejudice. *Id.*

---

[8]  This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc ).

22

No one has argued on appeal that Defendant's motion was untimely, and the district court was obviously very thorough in its inquiry. Therefore, we focus on whether there was good cause to appoint substitute counsel. *Garey*, 540 F.3d at 1263. Good cause for substitution of counsel exists where there is "a fundamental problem, such as a conflict of interest, a complete breakdown in communication, or an irreconcilable conflict which leads to an apparently unjust verdict." *Id.* (internal quotation marks omitted). Because good cause for substitution of counsel cannot be based solely on a defendant's perception, the latter's general loss of confidence or trust in his counsel, standing alone, is not sufficient. *Thomas*, 767 F.2d at 742.

Here, we conclude that the district court did not abuse its discretion in refusing to appoint defendant different counsel at sentencing. Faced with a strong-willed and very stubborn defendant, the court made painstaking efforts to explain to him his rights, accommodate his requests, and afford him the counsel to which he was constitutionally entitled. Defendant argues, however, that Golder labored under a conflict of interest because, in response to the court's inquiries, she had spelled out strategic differences between herself and Defendant, which disagreements had led to Defendant's initial request that he be allowed to proceed pro se. Counsel's responses, Defendant alleges, disparaged him and his efforts to blame the kidnapping on the Russian mob. Defendant also argues that there was a complete break-down of communications between him and counsel.

23

As to Defendant's contention that the district court should have appointed new counsel because Golder aired the disagreements with her client, we disagree, even though it might have been better practice for Golder to file her motion under seal.  When a defendant asks a court to appoint substitute counsel, the court has an affirmative duty to inquire into the disagreement with existing counsel to determine if there is, in fact, good cause to do so.  *Id.* at 741; *see also United States v. Mendez-Sanchez*, 563 F.3d 935, 942 (9th Cir. 2009) ("The inquiry must be adequate to create a sufficient basis for reaching an informed decision." (internal quotation marks omitted)).  With such inquiries, a court will necessarily gain some insight into the dialogue between a defendant and his lawyer.  *See, e.g.*, *United States v. Van Anh*, 523 F.3d 43, 49 (2d Cir. 2008) (at hearing on motion for substitute counsel, existing counsel explained defendant's attitude and discussions she had with defendant, including the weight of evidence against him); *Mendez-Sanchez*, 563 F.3d at 943 ("many questions were targeted toward understanding the crux of the disagreement between [the defendant] and his attorneys").

Absent the ability to make such an inquiry, a court would be forced to simply accept a defendant's word that new counsel is necessary.  Further, the district court's need to inquire here was evident because this was Defendant's second trip down this same road, having requested appointed counsel in the first instance because of disagreements between him and his original retained counsel.

24

Although Defendant had twice asked the district court for a different lawyer, he now essentially complains on appeal that he was required to justify that request. He cannot have it both ways.

Moreover, any disclosure by Golder of the underlying disagreement between her and Defendant provided no big surprises to the district court, as it was the same disagreement that existed between Defendant and his first attorney. In fact, it was Defendant who openly shared the basis of the disagreement with the court at both the hearing to replace Iacullo and the hearing to terminate Golder's representation. Indeed, at that first hearing, retained counsel Iacullo had indicated that Defendant wished to "go down a path" that would lead to the Government introducing damaging evidence that could negatively impact every aspect of sentencing, including a reduction for acceptance of responsibility. Although Iacullo was not specific about the particular strategic differences between him and his client, Defendant was not timid about filling in the blanks for the court, explaining the reasons he wanted to call Anna and Mario to testify. Likewise, at the second hearing, Defendant was similarly forthcoming in his efforts to convince the court that differences between him and Golder were so significant that Golder should be dismissed as his attorney. He even announced in the prosecutors' presence that the court could tell the prosecutors about his plan to challenge the enhancements

25

because "it is no secret."  In short, Defendant made public from the outset the position he would be taking at sentencing.

Moreover, to the extent that Defendant is complaining that his attorney's responses to the court's inquiries necessarily disparaged his intended defense, it is axiomatic that an attorney's acknowledgement that she disagrees with the wisdom of a particular approach will be interpreted as a criticism of that approach.[9]  For sure, a court's exploration of the basis of a disagreement between an attorney and his client will also necessarily plow that ground to some extent.  But there is no indication—implicit or explicit—that the court here reached its ultimate decision as to the truthfulness of Defendant's "defense" at sentencing based on a cursory rubber-stamp of something a prior attorney may have said.  To the contrary, the record makes clear that the district court diligently, patiently, and fairly heard Defendant out as to all of his explanations regarding the reasons for his criminal conduct.  Indeed, the transcript of the sentencing hearing, which lasted two days, is over 350 pages in length.  Throughout that hearing, there was extensive dialogue between the court and Defendant, and the former displayed an open mind in considering Defendant's assertions and articulated its struggle to try to understand

---

[9]  Defendant also argues that a conflict of interest arose between him and Golder because she violated her ethical obligations by, for example, failing to file ex parte her motion to withdraw, or at least sensitive portions of that document.  Even if one assumes that, in trying to sort out the problems between her and Defendant, Golder violated some ethical obligation, we perceive no egregious breach.  Further, a "breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel." *Mickens v. Taylor*, 535 U.S. 162, 176 (2002) (quoting *Nix v. Whiteside*, 475 U.S. 157, 165 (1986)).

26

how a 51-year old lawyer with no criminal record could have been involved in such a serious crime.  As to whether there had been a total breakdown of communications between Golder and Defendant sufficient to warrant substitution of counsel, there was clearly discord between Defendant and Golder, just as there had been between him and Iacullo.  But we cannot say that there was a complete breakdown in communication.  In fact, Golder stated affirmatively that she could still effectively represent Defendant if he would allow her to do so.  *See Calderon*, 127 F.3d at 1343 (total breakdown in communication did not occur where defendant's accusations showed that he was displeased with counsel, but counsel attested that he did not take the accusations personally and could effectively argue sentencing issues).  Yet, Defendant offered no reciprocity as he remained adamant that Golder not represent him.  We conclude that stubbornness on Defendant's part does not constitute an irrevocable breakdown in communications.  Again, a defendant's general loss of confidence or trust in his counsel is not sufficient, by itself, to create an inference that the relationship between counsel and client has been too damaged to permit counsel to render effective assistance.  *See Thomas*, 767 F.2d at 742 (11th Cir. 1985); *see also Harding v. Davis*, 878 F.2d 1341, 1344 n.2 (11th Cir. 1989) ("uphold[ing] the rule that an accused cannot force the appointment of new counsel by simply refusing to cooperate with his attorney, notwithstanding the attorney's competence and willingness to assist").

27

Finally, as noted above, we have held that even when a district court has abused its discretion by denying a defendant's motion to replace his appointed counsel at sentencing with new counsel, the defendant must still show prejudice as a result of the court's decision. *See Calderon*, 127 F.3d at 1343. Prejudice can be demonstrated by showing "that counsel's performance was not within the range of competence demanded of attorneys in criminal cases and that but for counsel's continued representation at the sentencing hearing, the result of the proceeding would have been different." *Id.* (internal quotation marks omitted).

We are faced with a different factual scenario here than in *Calderon* because Golder did not remain as sentencing counsel, given Defendant's insistence that she not act as his lawyer and his request to proceed pro se. Thus, we cannot know whether Golder's continued representation at the sentencing hearing would have negatively impacted the outcome of the proceedings.

Perhaps the more apt question is whether the outcome would have been different had the district court appointed Defendant a third attorney to represent him. It seems unlikely. As a practical matter, there are two probable outcomes had new counsel been appointed. First, just as with Iacullo and Golder, the third counsel and Defendant might have crossed swords over Defendant's insistence on pursuing what looked to be a self-destructive strategy, and the district court would have found itself right back where it started with now a third request by Defendant

28

for new counsel.  Alternatively, aware of the prior proceedings, a new attorney might have decided not to trigger Defendant's wrath by disagreeing with his intended strategy.  Instead, meekly complying with all of Defendant's directives concerning the sentencing hearing, this attorney would have proceeded just as Defendant did at sentencing:  play the tape recording, call Mario as a witness, and offer Defendant's testimony that he participated in the kidnapping conspiracy only because he thought the Russian mob would retaliate if he did not do so.

Yet, had this second scenario occurred, it is hard to see how the result would have been any different.  With the same evidence and the same arguments being presented to the district court, the latter would have presumably made the same credibility findings and reached the same sentencing decision as it did when Defendant acted as his own spokesman.  At any rate, whatever might have happened at a sentencing hearing in which Defendant was represented by a third attorney—whether good, bad, or indifferent from Defendant's vantage point—we do not rest our decision on an assessment of any prejudice that might have resulted or been alleviated by appointment of a third attorney.  Instead, we simply conclude that the district court did not abuse its discretion when it found no good cause to appoint Defendant new counsel.

## B.  <u>Defendant's Motion to Proceed Pro Se</u>

As soon as the court denied Defendant's motion to appoint new counsel, Defendant moved to proceed pro se. After conducting a full *Faretta* inquiry, the court granted his motion. Defendant now argues on appeal that his decision to proceed pro se was not knowing and voluntary. As with his first allegation of error, he seeks a new sentencing hearing, with new appointed counsel.

A district court's conclusion that a defendant has validly waived his right to counsel is a mixed question of law and fact that we review *de novo*.[10] *United States v. Cash*, 47 F.3d 1083, 1088 (11th Cir. 1995). On direct appeal, the prosecution bears the burden of proving the validity of the waiver. *Id.* A decision to proceed pro se must be knowing and voluntary. *Jones v. Walker*, 540 F.3d 1277, 1287–88 (11th Cir. 2008) (en banc). The "knowing and voluntary" standard considers whether the defendant knows the risks of proceeding without a lawyer and voluntarily makes the decision to proceed without counsel in light of those risks. *See United States v. Kimball*, 291 F.3d 726, 731 (11th Cir. 2002). It is not concerned with whether the defendant has the necessary legal knowledge to conduct his own defense. *Id.*

---

[10] Our court has not yet decided in a published decision whether the *de novo* standard of review becomes a plain error standard when a defendant has failed to challenge in the district court the validity of his waiver. *See United States v. Stanley*, 739 F.3d 633, 644–45 (11th Cir. 2014). As in *Stanley*, Defendant's argument fails under either standard. We therefore examine Defendant's claim *de novo*.

30

We have identified several factors that are important in determining whether a defendant's decision to proceed pro se is knowing and voluntary, including:  (1) the defendant's age, health, and education; (2) his contact with lawyers prior to trial; (3) his knowledge of the nature of the charges and possible defenses and penalties; (4) his understanding of the rules of evidence, procedure, and courtroom decorum; (5) his experience in criminal trials; (6) whether standby counsel was appointed and, if so, the extent to which standby counsel aided in the trial; (7) any mistreatment or coercion of the defendant; and (8) whether the defendant was attempting to manipulate the trial.  *Id.* at 730–31.  "All factors need not point in the same direction."  *Cash*, 47 F.3d at 1089.

Defendant first argues that his decision to proceed pro se could not have been knowing and voluntary because the court presented him with a Hobson's choice:  go forward with conflicted counsel or proceed pro se.  But as discussed *supra*, Defendant did not have conflicted counsel.  Once the district court made that determination, it properly presented Defendant with the only two options to which he was constitutionally entitled:  accept representation from Golder or waive the right to counsel and proceed pro se.  "[A] district court does not compromise the defendant's free choice by presenting him with accurate information regarding his lawful choices and asking him to choose between them."  *Garey*, 540 F.3d at 1265–66.  In short, the court's refusal to appoint different counsel did not negate

31

Defendant's subsequent ability to knowingly and voluntarily choose to represent himself.

Defendant also argues that the involuntariness of his waiver is illustrated by the fact that during the colloquy concerning whether he could be transferred to a facility with a law library, he vacillated in his request to represent himself, based on that uncertainty. We are unpersuaded by this argument. The record shows some vacillation on Defendant's part based on the absence of a law library, but only up to the point when he finally understood that the court would not be appointing him new counsel. Once that realization sunk in, Defendant was quite decisive in announcing his decision to represent himself. Indeed, Defendant's overriding concern throughout the hearing was maintaining his ability to call all the shots at his sentencing hearing. And while he might have preferred having a compliant lawyer at his side to act as his mouthpiece during sentencing, it was clear that Defendant was ready to go it alone rather than cede control to an attorney who did not totally buy into Defendant's plans.[11]

Finally, a review of the record in its entirety, as measured against the factors used in evaluating the voluntariness of a defendant's waiver of counsel, persuades

---

[11] Defendant also cites the fact that he was unable to have access to case materials and voice recordings while in jail awaiting sentencing. Logistical issues arising from Defendant's incarceration, however, were a reality that the court could not change and one that Defendant necessarily accepted when he chose to represent himself. *See Faretta*, 422 U.S. at 835 ("When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel.").

us that Defendant was well aware of the risks and dangers he faced, but notwithstanding that knowledge, he voluntarily chose to waive his right to counsel. Defendant was a healthy, 51-year old lawyer who had practiced civil litigation for thirty years. And while he testified that he had experience in at least one previous criminal case, waiver of counsel may be valid even if the defendant has no previous criminal trial experience. *See United States v. Stanley*, 739 F.3d 633, 648 (11th Cir. 2014).

Indeed, Defendant's long experience as a litigator sets him apart from most other defendants whom an appellate court typically encounters in this type of review. As an experienced lawyer, Defendant understood courtroom decorum and procedure, and also knew that the rules of evidence did not apply at sentencing. It is clear that he knew his overriding goal at the sentencing hearing was to persuade the court to impose as low a sentence as possible. In fact, he conducted himself professionally during the sentencing proceedings and, as unwise as his legal strategy may have been, he was able to challenge the PSR, question witnesses, and present his own testimony.

The record also demonstrates that Defendant understood the serious charges and penalties he faced, including a possible life sentence and loss of a sentencing reduction for acceptance of responsibility. Virtually every participant in the proceedings warned him of the dangers a defendant confronts when he represents

33

himself and that he specifically faced based on the implausible explanation he intended to offer for his criminal conduct. Yet, aware of all of this, Defendant insisted he could best represent his own interests, telling the court, "No one knows my life better than me."

Further, there was no mistreatment or coercion of Defendant. To the contrary, the district court granted his first request for appointment of counsel and, as to Defendant's second request for new counsel, the court patiently and thoroughly explained to Defendant all of his options and the particular pitfalls that self-representation entails. Indeed, the court's thorough inquiry and emphatic warning that Defendant's decision to represent himself was a mistake undercuts any inference that Defendant was somehow bulldozed into choosing to represent himself.

Finally, Defendant did have standby counsel, although it is true that she did not figure prominently in the sentencing hearing. However, not every factor must weigh in favor of the court's decision. *See Cash*, 47 F.3d at 1089. In short, as did the district court, we conclude that Defendant knowingly and voluntarily waived his right to counsel and chose to represent himself at sentencing.

## III. CONCLUSION

For all the above reasons, we find no reversible error and affirm Defendant's sentence.

**AFFIRMED.**